# Case No. 4,417.

## The ELMIRA.

[23 Int. Rev. Rec. 338; 2 Cin. Law Bul. 294.]

District Court, E. D. Michigan.  March 19, 1877.

Messrs. Moore and Canfield, for libellants.
Luther Beckwith, for claimants.

BROWN, District Judge. It seems the propeller left Tonawanda with a supply of fuel insufficient to take her through to the river, and although she may have been guilty of fault in that particular, it did not contribute to the subsequent loss in any such sense as would make the propeller responsible therefor. After reaching Long point the wind which had been to the northward veered around to the southward, and the propeller took her course along the south shore until she reached Cleveland. The weather during the day had been threatening but not stormy, and the master of the propeller decided to leave the barges outside, and about a mile

and a quarter from the piers, and go into the river for a supply of coal. He intimated his intention to the barges by hailing the Chamberlain, ordering her to cast anchor as he was going into Cleveland for coal, and said he would send a tug out to tow the barges in. It seems, from the testimony of the mate of the propeller, that the propriety of leaving the barges there, while the weather was so threatening, was discussed between him and the master, who finally decided to leave them, go into Cleveland and send a tug out to their assistance. The answer admits that the propeller might have towed the barges in herself, at that time, if she had seen fit to do so, and why this was not done, does not clearly appear, since the master as before observed, expressed his intention of sending a tug out. I am more inclined to think, however, he never intended to do this. On her way in, the propeller met a tug going out, the master of which hailed the propeller and asked if he wanted his barges towed in; to this the master of the propeller replied, "Go and see." The tug it seems did go out and hailed the stern barge and asked if she wanted to be towed in; the master of the barge supposing the propeller would return soon declined, and the tug left without making further efforts in that direction. During the evening, and while the propeller was coaling, the master went to the government signal office no less than three times to learn the indications of the weather, which continued to be threatening until about 9 o'clock, when the wind suddenly chopped around from the south to the north of west and began to blow with great violence. Captain Tebeau went to the masthead of the propeller to see how his barges were weathering the storm, but made no effort to save them. He also denies seeing their signal lights for assistance. By 11 o'clock, and probably by 10, the weather had become so stormy that any such effort would have been useless.

While it is undoubtedly customary to leave a tow of barges outside in pleasant weather, I think it showed a great lack of prudence to do so under the indications that evening. The testimony, including that of the officers of the propeller itself, is almost uncontradicted that the weather looked very bad, and the indications of a storm such that its approach could be predicted almost to a certainty. But the fault of the master in this particular was surpassed by his conduct during the evening. Instead of going out himself, or sending a tug, as the indications grew more threatening, he made no efforts to save them whatever, until the storm burst upon them with such fury, that all efforts would have been unavailing. If he were so anxious about the weather that he deemed it necessary to visit the signal office three times during the evening, he certainly should have shown solicitude enough for the safety of the barges to have sent a tug to their assistance. Having elected to take the chances of their riding out the storm in safety he cannot now be heard to complain of his ill luck. While the propeller was coaling at her dock, a tug lay directly astern of her awaiting an engagement. He was guilty not only of gross negligence, for which the propeller must be condemned, but of an indifference to the lives of those in his charge, approximating closely to inhumanity.

There was no unskillfulness shown on the part of the Chamberlain in holding on to the other barges as long as she could. She had every reason to expect that the propeller or a tug would come out to her assistance, and in order to pick them all up, in such weather as that, it was necessary that she should hold on to the rear barges. After all hope of this kind was abandoned, and the storm became so violent as to drag her anchor, she cast them off, let out more chain and did what she could to hold on alone. It seems that in letting out more chain, about midnight, the butt end of one of the chain shackels got caught in the norman, by which the shackel pin was broken and the anchor lost. It is insisted that if the round end of the shackel had been turned toward the anchor, this accident would not have occurred, the anchor would not have been lost, and the barge would have ridden out the storm in safety. While it is quite probable that this is the better mode of attaching the shackels, it is by no means universal to do so. Indeed the testimony shows that they are frequently fastened with the lug end outward, and in this conflict of opinion I certainly cannot pronounce this method of fastening to be such a fault as would condemn the barge, certainly without clear proof that her loss was attributable to it. The accident was such a one as might have happened with the most skillful management, and I see nothing in connection with it that I can call faulty or negligent seamanship. The master of the propeller says that he was familiar with the outfit, condition, and sailing qualities of the barge; that he had towed her frequently before, and knew that she had but a single anchor. With this knowledge his abandonment of her is the more reprehensible.

Nor was the barge in fault for not taking a tug and being towed in. Not only is there an entire lack of evidence showing that she had an opportunity of doing this, but the Elmira had contracted to take her safely back to Bay City. She had left the barge for a temporary purpose, and the master of the Chamberlain had a right to rely on her speedy return, or at least, on her sending out a tug if good judgment required that the barges should be towed in.

The barge was not in fault in making no effort to set sail and get off the shore. Being a flat bottomed vessel, drawing but eighteen inches of water and light, an attempt to make sail could only have resulted in her destruction. I have no doubt she did the best thing that was possible under the circumstances.

Considering the gross negligence of the propeller in leaving the barges in this predicament, claimants ought to be held to strict proof that the faults of the barge, if any there were, were the cause of her loss. The Blanche Page [Case No. 1,523]. As another of the tow, viz., the Kelley, also went ashore that night, it would seem that all efforts to save the Chamberlain, by her own exertions, must have proved fruitless A decree will be entered condemning the propeller and referring it to a commissioner to assess the damages.