THE LUDVIG HOLBERG.

THE LEONARD RICHARDS.

THE F. O. MATTHIESSEN & WIECHERS SUGAR REFINERY CO. *v.* THE LUD-
VIG HOLBERG and THE LEONARD RICHARDS.  STAFFORD *v.* SAME.

*(District Court, S. D. New York. November 26, 1888.)*

1. COLLISION—FOG—SIGNALS—CONFLICTING TESTIMONY.
    The small steamer L. H., bound out from New York, on May 24, 1887, col-
    lided in the lower bay at about 4:25 P. M., near buoy No. 11, with an inward
    bound bark, towed by the tug R.  Upon extremely conflicting testimony the
    court found that for at least 15 minutes before collision there was so much
    fog between the Narrows and buoy No. 11, 3 miles below, as to prevent vessels
    seeing each other for more than a short distance.  *Held*, that fog-signals were
    then required to be sounded.

2. SAME—TUG AND TOW—FOG-SIGNALS.
    A tug which tows a bark on a long hawser astern in fog, should indicate
    the presence of her tow astern by signals.  *The City of Alexandria*, 31 Fed.
    Rep. 427, followed.

3. SAME—CASE STATED—SPEED—NEW YORK TIDAL CURRENTS.
    A steamer going "dead slow" in fog, met a tug a little on her starboard bow,
    and starboarded her helm, and passed her in safety, having received two blasts
    of the tug's whistle, but no signal to show a tow astern.  The tug had a bark
    in tow on a hawser over 70 fathoms long, which was not seen in the fog.  The
    bark was not in line, but to starboard of the tug, and her wheel was ported as
    soon as she was seen from the steamer.  The latter being unable to clear her
    by going to port, ported so as to go between the tug and bark, and reversed
    full speed. and hailed to cast off the hawser, which was not done.  The tug
    and bark did not stop, and the steamer's starboard bow struck and parted the
    hawser, swinging the steamer's stem to port, and striking the bark's port
    quarter at an angle of about three points.  In actions for this collision on
    behalf of the bark and cargo against the steamer, (to which the tug was not
    made party, owing to her arrest in another district,) *held*, that the steamer was
    free from fault; that the collision was due to lack of proper fog-signals to show
    a tow astern, and to not casting off the hawser.  *Also held*, that the steamer's
    testimony as to her speed was confirmed by coast survey reports of the tidal
    currents in New York harbor.  See abstract in note to opinion, (page 917.)

In Admiralty.  Libels for damages.

Libels by the F. O. Matthiessen and Wiechers Sugar Refinery Com-
pany and by owners of the bark against the steam-ship Ludvig Holberg,
impleaded with the steam-tug Leonard Richards, for damages resulting
from collision.

*Sidney Chubb,* (*Geo. A. Block,* of counsel,) for refinery company, libelant.

*Owen & Gray,* for libelant, Stafford.

*Wing, Shoudy & Putnam,* for the Ludvig Holberg.

BROWN, J.   On the 24th of May, 1887, as the bark Quickstep was
coming up the lower bay in tow of the tug Leonard Richards, upon a
hawser from 70 to 100 fathoms long, she came into collision with the
steam-ship Ludvig Holberg on her way out to sea.   She was struck on
her port quarter, a little aft of the mizzen chains, by the steamer's port
bow or stem, at an angle of about three points, and a large hole stove in,
through which she speedily filled with water.   Before sinking she was
towed by the tug a few lengths only, to the flats on the west bank, about

one-quarter of a mile below buoy No. 11. The above libels were filed to recover $87,000 for the loss of ship and cargo. The collision took place about 4:25 P. M. The testimony is extremely conflicting whether at that time, or shortly before, there was enough fog to interfere with ordinary navigation, and to require fog-signals. Most of the libelants' witnesses affirm that there was not; and no fog-signals were given by them. The respondents' witnesses maintain that the fog had set in from 15 to 30 minutes before, and became so dense that neither the tug nor the bark could be seen over 400 feet distant; that the steamer was going dead slow, not over 3½ knots speed, and was regularly sounding her fog-whistle. The witnesses from the tug and the bark testify that at and before the collision, though the weather was hazy, vessels could be seen half a mile distant; that the steamer was seen at that distance; that no fog-whistles were sounded, and that none were needed. Witnesses from other vessels were called to substantiate the account of each on this point. For the libelants, officers from the Old Dominion and the Wyanoke, which were going out to sea at about the same time with the Holberg, and ahead of her, testified that they met no dense fog until they reached the entrance of the Swash channel, at buoy No. 8, about a mile and a half below the place of collision; the former at 4:26 P. M., the latter at 4:32. The latter, however, in her log noted that it was foggy at 4:20, and, though buoy No. 8 was seen by her officers before it was reached, it could not be seen when passed very near. Both those vessels saw the tug and bark when they passed them from 300 to 500 yards distant. The master of the St. Johns, which runs on schedule time between pier 8 and Sandy Hook, and passed the tug and bark still nearer the time of collision, and a little to the westward of them, testifies that he found it densely foggy from the Narrows downwards; and the officer in charge at Fort Tompkins-light, whose duty it was to observe and enter the weather, testified that a dense fog came on at 4 P. M., and was so noted in his record; and another witness, from the earthworks of Fort Wadsworth above, testified to the same effect.

Upon repeated consideration of this most embarrassing testimony, I must find that during a period of at least 15 minutes before the collision there was so much fog between the Narrows and buoy No. 11, as to prevent vessels being visible to each other for more than a short distance; such as to require the sounding of fog-signals under the rules; and that such signals were sounded by the Holberg, as her witnesses state; that these signals were heard by the St. Johns, as testified to; that the Holberg was at that time going "dead slow," not over 3½ knots; that the tug became first visible only a few hundred feet off, a little on the steamer's starboard bow; that neither the bark nor the hawser was then visible, and that no signals indicated to the steamer that the tug had a tow some 400 or 500 feet behind her; that the steamer rightly starboarded on receiving a signal of two whistles from the tug when she was first seen, and passed at a safe distance from the latter, starboard to starboard; that through the want of any signals from the tug to indicate, as required by the rules, that she had a tow behind her, the steamer was unable to avoid the bark, which she might, and undoubtedly would, have avoided, had

such signals been given; that the bark was not following directly after the tug, but was to starboard of her, and, by putting her wheel hard a-port, threw her head somewhat more to starboard, seeing which, the steamer properly ported, in order to go between the tug and the bark, at the same time hailing the tug to cast off the hawser; that if the hawser had been cast off promptly, the steamer would probably have gone safely between the two; that the hawser was not cast off, and the steamer, running against it with her starboard bow, parted it; and at the same time her bow was swung to port, resulting in collision with the bark's port quarter; that the steamer reversed as soon as danger from the bark was apparent, and was nearly stopped at the collision; that the tug and bark did not stop, and that the force of the blow arose mainly from the forward motion of the bark. The following considerations have led me to this conclusion:

1. It is to be noted, though I do not lay great stress upon this circumstance, that although the channel-way was three-quarters of a mile wide, these vessels at the time of the collision were very near the westerly side. This is the more peculiar as respects the tug and bark, inward bound, since, if there was no fog, and both shores could be seen, as they allege, their direct and natural course was apparently on the easterly side of the channel. I do not find any explanation, other than foggy weather, of their shaping their course to the left, almost to the limit of the channel-way; while the courses of both the tug and the steamer would be natural enough, if they were feeling their way in a fog along the line of the buoys, which, as seen from time to time, would give them assurance of their positions.

2. The general narrative of the steamer's witnesses is in the main straightforward, intelligible, and consistent. The story of the pilot of the bark is so confused, and, as it seems to me, so inconsistent, as to be scarcely intelligible. The bark's testimony that the steamer was seen half a mile distant, and that the bark was almost directly in line behind the tow, allows no rational explanation of the collision. As the steamer went well clear of the tug, and to the eastward of her, after the exchange of two whistles, it is incredible, if the bark, being from 450 to 600 feet behind the tug, was in line, or nearly in line, with the tug, and in plain view, that the steamer could have run into her, unless it were done deliberately. The pilot of the bark, moreover, gave five different orders for a change of helm, four of which were obeyed; the fifth being just at the moment of collision. The wheelsman, Ludden, who gives the clearest account of these particulars, states that they were all given in quick succession, and that the steamer was first seen a little on the port bow. The other wheelsman says she was a quarter of a point on the port bow. The first order was hard a-starboard. As soon as the helm was hard over, came the order hard a-port; next, hard a-starboard; then hard a-port, as the steamer was just on the point of striking the hawser, or afterwards,—I cannot make out with certainty whether before or after; and again hard a-starboard, after the hawser was parted, and at the moment of collision. The evident confusion and hurry of these orders, and the express testimony of the witness Ludden, show that they were given within a very short

interval.   No reliance can be placed on his estimate of eight minutes. The change of heading on the first two orders he estimates at only half a point.   The first order, hard a-starboard, was given when the signal of two whistles was exchanged; and the rapid succession of the orders shows that the steamer could have been then only a short distance from the tug, as the steamer's witnesses assert.   Nothing but fog can rationally explain these hurried and confused orders.   Her changes were more numerous and much nearer together than those of the Harvest Queen. *The Adriatic,* 107 U. S. 512, 518, 2 Sup Ct. Rep. 355.

3.  Unless there was such fog as to require the fog whistles to be sounded in the judgment of the master and pilot of the steamer, and unless they did sound their fog-signals, and reduce their speed first to "half speed," and next to "slow," their narrative is a sheer fabrication.   There is not sufficient evidence to warrant finding their testimony a fabrication.   Their evidence is in no way impeached, and they are sustained by several witnesses, wholly disinterested.

4.  The steamer's time from her wharf to the place of collision, to which reference has been made by counsel, rather confirms than weakens her witnesses' statement as to her slowing on account of fog.   Taking the libelants' estimated time of getting under way, after turning, at 3:15 P. M.,—the latest that the testimony will reasonably admit,—we find a little over $9\frac{1}{2}$ nautical miles to the place of collision, run in an hour and ten minutes.   It was low water that afternoon at Governor's island, according to the government tide-tables, at 2:32 P. M.; but the current runs ebb out of the East river 1 hour 16 minutes after low water, and out of the North river, and through the Narrows, for over $2\frac{1}{2}$ hours after low water; so that the steamer had the benefit of the outward current all the way, at the average rate of about a knot an hour.[1]   Practically, therefore, the distance from abreast of Bedloe's island (where the steamer was under full speed of at least 9 knots, at about 3:25 P. M.) was only about $8\frac{1}{2}$ knots; and, had she not slowed at all, she would have been at 4:25 P. M. half a mile below the place of collision.   She had probably been running "slow" about 5 minutes before collision, and at "half speed," viz., $6\frac{1}{2}$ to 7 knots, from below Craven's shoals, as the pilot at first stated,

[1] The well-known difference between the rise and fall of the tides and the flood and ebb currents in the harbor of New York, have been carefully observed and tabulated in the reports of the coast survey.  Independent of the effects of freshets, or of high winds, it appears that (1) the mean interval of high water at Sandy Hook, after the moon souths, is 7 h. 35 min., varying from this about half an hour each way during each lunar period, *i. e.,* about half an hour earlier, roughly speaking, towards the middle of the moon's first and third quarters, and a half hour later about the middle of the second and fourth quarters.  At Governor's island the mean interval is 32 min. greater, or 8 h. 7 min. after the moon souths, with similar variations.   (2) The slack before flood and ebb lasts about 20 min.; in the East river, 10 min.; in North river, 35 min.   (3) Between Governor's and Bedloe's islands the current begins to run ebb 2 h. 35 min. after high water there; continues ebb 7 h. 07 min., *i. e.,* till about 3 h. 10 min. after low water, when it becomes slack for 20 min.; and then runs flood for 4 h. 33 min., or 2 h. 15 min. after high water.  In the main channel off the West bank the current changes only about a half hour earlier each way.   (4) Between Governor's island and the Battery the current begins to run ebb 1 h. 46 min. after high water; continues ebb for 6 h., or till 1 h. 16 min. after low water; then after 10 min. slack it runs flood for 6 h. or until 1 h. 26 min. after high water.   (5) At the Narrows the ebb current begins 1 h. 40 min. after high water at Governor's island; the flood, 2 h. 20 min. after low water at the same place.   (6) During the last two hours of the ebb current in the North river and at the Narrows, there is a flood current of salt (heavier) water 15 ft. below the surface; and

for some 10 minutes preceding. The place of collison was probably very near buoy 11, the south-westerly current carrying the bark afterwards more southerly to the point where she grounded.

5. The discrepancies between the outside witnesses, as regards the density of the fog, may be accounted for in part by the difference in location, and the fact, which several mention, that the fog was variable, lifting up at one time and settling down at another; and in part by the different judgments that different persons would form as to the density of the fog, the distance at which they could see objects, and the degree of density that make fog-signals necessary, as well as the different habits of different masters in regard to sounding fog-signals. It is certainly significant, considering that the weather had been thick and hazy before, that the chief officer of the Wyanoke noted in his log that the weather was "foggy" at 4:20 P. M. If the Wyanoke did not reduce speed until she reached the Swash channel, she must have been, at 4:20, above buoy 11, and found it "foggy" there; and that would agree with the time when the Holberg changed to "slow," five minutes before collision. Some further explanation of the discrepancies between the witnesses of the bark and the Ludvig Holberg may be found in the fact, often testified to before me, that objects cannot be distinguished so easily, or so far, in looking towards the fog as in looking away from it. The bark's witnesses may therefore have been able to distinguish the steamer before the latter could distinguish the bark. A number of the bark's witnesses, moreover, estimate the distance at which they could see the steamer at a half a mile, or "inside of half a mile." This indicates the presence of very considerable fog. As regards signals, the mate of the tug and the pilot of the bark differ. There is no question that the steam-tug gave one or two single blasts of the whistle, and afterwards a signal of two blasts. The first blasts were understood by the steamer as fog-signals; and, on looking sharply, when the first whistles were heard, the tug could not be seen. Presently, and as soon as she could be seen, the tug was observed a little on the steamer's starboard bow, and signals of two blasts were immediately exchanged. I think it was then that the bark put her helm hard a-starboard, and that that was her first order. I

the same in first hour of the ebb in the North river. (7) Off the Battery the current runs ebb in the North river 1 h. 54 min. later than in the East river; and runs flood 38 min later. (8) In Buttermilk channel the flood current commences 47 min. earlier than between the Battery and Governor's island, the ebb current 32 min. earlier. (9) The average *time* the currents run is as follows : In the main channel off Sandy Hook, flood, 4 h. 56 min.; ebb, 6 h. 44 min. Off the West bank, flood, 4 h. 25 min.; ebb, 7 h. 15 min. At the Narrows, flood, 4 h. 21 min.; ebb, 7 h. 19 min. Between Bedloe's and Governor's islands, flood, 4 h. 53 min.; ebb, 7 h. 27 min. Between the Battery and Governor's island, flood, 5 h. 51 min.; ebb, 5 h. 49 min. Buttermilk channel, flood, 6 h. 06 min.; ebb, 5 h. 34 min. (10) The ebb and flood currents reach their maximum velocities about the end of the current's second hour; the flood a little earlier than the ebb. The average maximum of the ebb current at the Narrows is about 1.5 knots; of the flood, 1.2 knots. At Thirty-Ninth street, North river, maximum ebb, 2.7 knots; flood, 2 knots. East river and Twenty-Third street, ebb, 2 knots; flood, 1.8 knots. Off the Battery, in both the North and East rivers, about 2 knots, both flood and ebb. In the first and last hours the currents are about half these rates. All the above are only proximate statements and mean averages, as near as ascertainable; there being minor differences at different times and places, and daily fluctuations, with other variations under extraordinary circumstances. See Coast Survey Reports for 1865, pp. 167–169; for 1888, bulletin No. 3; Tide-Tables of 1888, pp. 216, 217; Charts, Army Building, N. Y., High Water, as per government tide-tables. Others differ.

doubt whether any previous signal of two blasts was given. The mate of the tug states that only one signal of two blasts was given by the tug. Upon all this testimony, I think the claimant's account of the matter the most rational and probable; that the primary fault was in the tug for using so long a hawser, and for giving no fog-signals indicating the presence of a tow. These faults are the same as in the case of the *City of Alexandria*, 31 Fed. Rep. 427. Upon these facts I cannot find the Ludvig Holberg in fault. She was going dead slow. She properly went to the left, under a signal of two whistles, and a starboard wheel. Had the bark maintained her own starboard wheel as at first, the wheelsman of the latter says they would "decidedly have gone clear, starboard to starboard." Both vessels were comparatively small,—the bark but 170 feet long, the steamer, 200 feet. Both could change their direction, therefore, much quicker than larger vessels; and, unless the bark was much more out of line with the tug than her witnesses admit. the wheelsman's judgment must be correct. If she was so much out of line as the steamer's witnesses estimate, perhaps that is doubtful. The bark, however, by putting her helm hard a-port after starboarding, destroyed what chance there was of avoiding collision by going starboard to starboard; and in that situation, I have no doubt the steamer did right in porting, so as to go between the tug and bark; at the same time hailing them to cast off the hawser. This ought to have been done. *The Galileo*, 28 Fed. Rep. 469, 473, 474. It was not the steamer's fault that it was not done. Nor can I find that she did not reverse as soon as the presence and situation of the bark could be discerned. I am not called on to determine whether the bark was in fault in making these numerous changes of helm. Accepting, in the main, the steamer's testimony as to the fog, these changes would seem to be the result of the discovery of the steamer nearly upon her, and to have been made *in extremis*. The true immediate cause of the collision, in my judgment, was the failure to sound the proper fog-signals to indicate the presence of a tow, or to cast of the hawser. The libels must be dismissed, with costs.

