SOUTH SHIELDS STEAM SHIPPING CO., Limited, v. FORBES et al.

(District Court, S. D. New York. January 16, 1900.)

1. SHIPPING—CONSTRUCTION OF CHARTER—OPTION—DREADING CLAUSE.

A charter by which the charterer was to furnish a cargo of 4,071 tons of heavy grain, with privilege of loading 750 tons of general cargo "in lieu of a like quantity of grain, * * * total freight to be equivalent to full cargo of grain," must be construed as giving him the right to substitute such general cargo for a like weight of grain, and requires the ship, to be entitled to recover freight for a full cargo, to supply sufficient cargo space for 750 tons of general cargo, besides the space required for the remainder of a full cargo of grain.

2. SAME—FULL CARGO—PLIMSOLL MARK.

Under a charter requiring the charterer to furnish a cargo of a given tonnage, "ten per cent. more or less, at steamer's option," the owners cannot require payment of freight on more than such weight, on the ground that the ship was not loaded to her Plimsoll mark, as contemplated by the charter, where the specified amount was furnished, and the master made no call for additional cargo at the time of loading.

3. "ADDITIONAL EXPENSES."

Various charges for dunnage, shifting berths, bagging, and mode of stowage considered.

In Admiralty. Suit to recover additional freight under a charter.

Convers & Kirlin (Geo. W. Betts, Jr., of counsel), for libelant.

Butler, Notman, Joline & Mynderse and F. M. Brown, for respondents.

BROWN, District Judge. The libelant claims certain balances alleged to be due to it for freight upon the transportation of a cargo of grain and general merchandise per steamer Glenmoor from Norfolk to Hamburg in February, 1897. The material parts of the contract under which the cargo was shipped, dated September 10, 1896, are as follows:

"Engaged from Mess. R. W. Forbes & Son of New York, for shipment in steamer Glenmoor from Baltimore, or Norfolk and/or Newport News to Leith, Hull, Newcastle-on-Tyne, Avonmouth Dock, Rotterdam, Amsterdam or Hamburg, one port only, nineteen thousand (19,000) quarters of heavy grain, ten per cent. (10%) more or less at steamer's option, at the respective rates of two shillings and ten pence half-penny (2/10½) if ordered to Leith, Hull, Newcastle-on-Tyne or Rotterdam; two shillings and eleven pence farthing (2/11¼) if ordered to Avonmouth Dock; three shillings (3/—) if ordered to Amsterdam or Hamburg, all per quarter of 480 lbs."

"Full cargo insurance to apply."

"Shippers to have privilege of shipping not exceeding seven hundred and fifty (750) tons of general cargo in lieu of a like quantity of grain, they paying all additional expense at port of loading above what grain cargo would cost, and total freight to be equivalent to full cargo of grain at the respective rates of two shillings and ten pence half-penny (2/10½) two shillings and eleven pence farthing (2/11¼) and three shillings (3/—) per quarter as above."

"Owners to have privilege of substituting another first-class steamer to fulfill this contract."

"The name of steamer which will fulfill this contract to be declared not later than first (1st) January, 1897."

Under the above contract, as appears from the pleadings and evidence, the Glenmoor was loaded at Norfolk with 3,280 tons of maize,

—"a heavy grain,"—equal to about 15,306⅔ quarters, and 830 tons, less a small fraction, of general merchandise, equivalent to 3,871⅓ quarters, making in all the equivalent of 19,178 quarters of grain. This cargo filled completely the space capacity of the ship, but not her full allowed draft down to her winter Plimsoll mark, as a full cargo of grain alone would have done, the libelant alleging a shortage of five inches, and the respondents admitting but one inch. For not loading the ship to her dead-weight capacity, in consequence of filling up with the bulkier general cargo instead of grain, the libelant claims freight upon the ship's whole dead-weight capacity, alleged to be 19,800 quarters. A second subject of dispute relates to the "additional expense at the port of loading" in taking the general merchandise above what it would have cost to take all grain.

1. The above brief form of agreement, though said to be considerably used, differs from the ordinary charter party. It does not in express terms bind the respondents to load a full cargo, nor does it in so many words bind the owners to give to the respondents the whole cargo space of the ship. Both these obligations, however, must be necessarily inferred from the express requirement, "total freight to be equivalent to full cargo of grain." For it is not credible that the respondents would agree to pay freight for a full cargo, without having the benefit of the ship's full cargo space and her full draft capacity; nor that the libelant should require payment by respondents of freight for a full cargo, and at the same time expect to reserve any of the ship's capacity for the carriage of other goods. The dispute on this head arises from the fact that the Glenmoor (aside from any question as to the manner of loading), while able to load to her dead-weight capacity with an all grain cargo, had not cargo space sufficient to do so, when 750 tons were of general cargo, which is bulkier and lighter.

I have no doubt that, as ruled upon the trial, the meaning of the clause "freight equivalent to a full cargo of grain" is, that the shippers, on receiving the benefit intended by the option granted them, should pay freight on her dead-weight capacity, since she could certainly take grain enough to load her down to her Plimsoll mark; and nothing less, therefore, would be equivalent to "a full cargo of grain." But this stipulation is a part of the option given shippers, called the "dreading clause," and is conditioned upon their having the benefit of it; viz., to load not exceeding 750 tons of general cargo in lieu of a like quantity of grain. The libelant concedes that this means in lieu of a like weight of grain. This clause, therefore, plainly requires the ship to supply sufficient cargo space for the 750 tons of general cargo as contracted for, besides the space required for the residue of a full cargo of grain. As the general cargo is to be in lieu of a like weight of grain, the necessary space required for the 750 tons of general cargo must be supplied in lieu of the space required by the 750 tons of grain; since otherwise the shippers could not load 750 tons of general cargo in lieu of 750 tons of grain, but only in lieu of 800 or 900 tons of grain, as the case may be, which is manifestly contrary to what was intended.

It is the same as if the ship being loaded to her Plimsoll mark with grain, the owners had agreed that the shippers might remove 750 tons of grain and, instead of that, load 750 tons of general cargo. In that case unless the ship could supply the sufficient space for the exercise of the option given, she could not recover the agreed consideration for it.

The contract does not differ in legal effect, as I view it, from what it would have been had it read: "Engaged a cargo of 4071 tons" (the equivalent of 19,000 quarters) "ten per cent. more or less at steamer's option; viz. general cargo at shippers option not exceeding 750 tons; the rest of the cargo to be of heavy grain." In both forms alike, the full dead-weight capacity could not become due to the ship unless she had space capacity enough to load her down to her allowed draft.

The libelant claims that the right to load 750 tons of general merchandise, was a mere privilege without any corresponding obligation on the part of the ship to supply the additional space required. I do not think this a reasonable construction, since it would impose an unreasonable burden upon the shippers, and would deprive them of one of the presumed objects of their option. Nor do I see any reason for distinguishing between this option given to the shippers, and the 10 per cent. option given to the ship, as respects the counter obligations imposed. The object of the latter option was to fill the steamer to her dead-weight capacity on the master's call, if necessary, for not exceeding 10 per cent. above the 19,000 quarters, and thereby earn full freight. This bound the respondents to make good any such call, or to pay for their failure. In like manner the option given to the respondents was to enable them to carry not exceeding 750 tons of general merchandise, which on the average is a lighter cargo than heavy grain, and for that reason would ordinarily take more room than grain, and if shipped alone would be required to pay a higher rate per ton. It is to the advantage of the shipper who has both heavy and light cargo for transportation, to combine them in the same vessel, in order that he may have the benefit both of the draft capacity of the ship and of her full cargo space. A full cargo of iron would leave much of the cargo space unoccupied. A cargo of light merchandise only, filling the entire cargo spaces, would not nearly load the ship to her draft capacity, and for that reason, as above stated, it must ordinarily pay a higher price per ton. By combining both heavy and light weights in the same cargo, and properly adjusting their relative proportions, the shipowner may secure payment for the whole weight capacity of his ship, while the shippers get the benefit of her whole space capacity for light weights at the rate stipulated. The respondents had both kinds of cargo, and the option given them was presumptively given for the above purpose. The ship thereby became obligated to supply cargo space sufficient to load her to her Plimsoll mark with the particular kinds of cargo agreed on, of which one part was to be not exceeding 750 tons of general merchandise at shipper's option. The limitation to 750 tons was in

her own interest, in order that too much additional cargo space above what a cargo of grain alone would need, might not be required of her.

So far, therefore, as the failure of the ship to be loaded to her full winter draft was owing to a lack of sufficient cargo space for 750 tons of general cargo and for the residue of her dead weight tonnage in grain, the deficiency was caused by the ship's insufficiency to answer the obligations of her contract; and to that extent she could not recover for this item.

Some comment has been made in regard to the manner in which the vessel was loaded, which it is urged was not as economical of space as it might have been in the distribution of the general cargo and of the grain. The same point is made in reference to the difference of expense, under the second head, as respects the number of bags necessary to be used. It appears, however, that the manner of loading and distributing the cargo, was a subject of fair consultation and agreement between the representatives of both parties, and for that reason should not now be deemed open to criticism by either.

Upon the above view of the contract, no liability for freight on the part of the respondents beyond the amount shipped would result, had the shippers observed the stipulation that the general cargo should not exceed 750 tons. The amount of general cargo loaded was in fact about 80 tons in excess of the 750 allowed them. The space occupied by this excess of 80 tons of general cargo, computed according to the average of the whole, could not have admitted more than 100 tons of grain, i. e. 20 more than of general merchandise, and probably less. It is stated that in the settlement made with the ship she had credit, however, for one inch slack draft, equivalent to 28 tons of grain; if this is correct, nothing would remain due to the ship under this claim.

I have considerable doubt, moreover, whether in any event the ship can be entitled to call upon the respondents to pay for any failure to load to her full draft, except upon a distinct notice and a call by the master under the steamer's option for more than 19,000 quarters, inasmuch as the amount actually loaded and paid for exceeded the equivalent of that amount, being as above stated, 19,138 quarters. In the absence of any such notice or call, 19,000 quarters under this agreement must be deemed prima facie to be a "full cargo": because that amount is evidently fixed by the agreement as approximately a "full cargo," and because there is nothing in the agreement requiring the shippers to load more than 19,000, unless there is a call for more under the option reserved, or something equivalent to a call. In the present case there was no such call, nor was any statement made at the time of loading of the full draft capacity of the ship.

The determination of the question whether a vessel is fully loaded to her Plimsoll mark, is not so simple as might be supposed. The ship may not be, and in this case was not, loaded upon an even keel; she may not be perfectly level; the observation of the Plimsoll mark

itself, except in perfectly still water, cannot be exactly correct; there is not only a difference between the ship's draft in salt water and in fresh, but for a similar reason there is a difference, at places like Norfolk, according to the time of the tide at which the observation is taken, and these differences themselves vary with the size of the vessel. For vessels of the size of the Glenmoor, the difference between the draft at Norfolk and the open sea is stated by the experts of both parties to be about an inch and a half, and the difference between high and low water, about half an inch. Considering the nature of these differences and that no subsequent opportunities for examination can be had, evidently all questions as to actual draft ought to be settled, if possible, at the time and place of loading; and where the master does not call for additional cargo under the option, nor make protest at the time, the amount loaded should be deemed to be accepted as a "full cargo."

The practice, as stated by the libelant's witness, is to make the call for more, if desired, towards the end of the loading. The excuse given in this case for not doing so is, that the ship was filled up at the close by the general cargo, so that it was useless to call for more. It is to be observed, however, that the general cargo loaded, being 80 tons in excess of the 750 allowed, was received by the master without any protest or objection, or any expression of dissatisfaction, other than the remark that the general cargo would not bring the ship down to her Plimsoll mark. On the day before the vessel sailed, however, there being some difference as to the actual depth of her loading, an appointment was made by the master with the respondents' representative to meet on the following morning for the purpose of having an exact survey of the draft. Before the latter arrived, the ship sailed between 6 and 7 a. m., so that no joint survey was made. The respondents' representative testifies that the hour assigned was 7:45 a. m. and that he arrived at 7:40; the captain says the time fixed was 6 a. m. I have no doubt that the former witness is correct, for the reason that his residence at the time was such that he could not possibly arrive at the hour stated by the captain, but did come by the earliest regular conveyance. The respondents' representative, however, had endeavored the previous afternoon to take the draft accurately with the aid of one of the ship's men; and this measurement, allowing an inch and a half for fresh water, would make the ship's draft but an inch less than her Plimsoll mark, and this conclusion I deem best sustained by the testimony. The master's reckoning allows three inches for fresh-water difference. My conclusion is that the master either intentionally avoided a joint survey, or regarded the respondents' measurements as sufficiently correct.

2. Under the clause requiring the shippers to pay "all additional expense at port of loading above what grain cargo would cost," the respondents must pay whatever extra charges were caused by the general cargo after deducting therefrom such expenses as were saved to the ship by not loading all grain. Of the various items on each side of this debit and credit account, no objection is made, as I un-

derstand, to the charge against the respondents for stevedoring
the general cargo.....................................$285 00
    Tally clerk......................................... 35 00
    And wharfage on lard.............................. 1 00

    Making .......................................$321 60

which should, therefore, be allowed. The item of dunnage, $132,
is also proved, and there is no contrary evidence showing that it
would have been needed for grain; that item is, therefore, allowed.
Wharfage for four additional days is claimed; I find that three days
only should be allowed, amounting to $59.49.

Eighty-one dollars is also claimed for towage on two moves of the
ship for the general cargo from the elevator where the grain was
loaded to Pinner's Point and Lambert's.

By the contract, however, the charterers had a right to two ports
of loading, Norfolk and Newport News; and by the custom at Norfolk,
testified to by the respondents, and not disputed, the shippers were
entitled to one removal of the ship at her expense for each 300 tons.
Pinner's Point and Lambert's were within the port of Norfolk, and
very much nearer than Newport News; and I find that the respond-
ents are not chargeable with these expenses, both on the ground of
custom, and also that they were a substitute for the right to send
the ship to Newport News for a part of her cargo, and much less
burdensome for the ship. The debit items allowed amount to $513.09.
Against this should be charged as saved to the ship, the expense of
elevating, trimming, etc., also the bagging and sewing saved and the
hire of 1,732 bags at about 3 cents per bag. The evidence shows
that under an existing contract the shipowners would have been
obliged to pay only at the rate of about 3 cents a bag. What might
have been the current price of bags otherwise, is, therefore, imma-
terial.

As respects the bags it is also urged that a portion of the general
cargo might have been placed on top of the grain in bulk, instead
of the five tiers of bags that were used, and that the ship should,
therefore, give credit for a saving of bags which might in that man-
ner have been made, but which were not in fact saved to the ship
through her own improper failure to make use of the general cargo
instead of bags for that purpose. This counter charge should not
be allowed, for the reason previously stated, namely, that the dis-
tribution of general cargo was made deliberately upon a substantial
agreement of the parties at the time upon consultation, and to their
mutual satisfaction. The master testifies that the precise point was
spoken of between him and Mr. Graham, the respondents' represen-
tative, and it was considered best not to put any part of this general
cargo on top of the grain. The parties can probably agree upon
the amount saved for elevator and bagging and sewing charges;
if not, a reference may be taken upon those points.

Decree accordingly.