THE GERMANIC (two cases).

(District Court, S. D. New York. February 28, 1901.)

1. SHIPPING—CARGO DAMAGE—NEGLIGENT DISCHARGE.

It is the duty of a ship to pay attention to any extraordinary circumstances that evidently affect her stability while discharging, and to regulate her mode of discharge accordingly, so as not to endanger the cargo. Negligence in such regard, which results in damage to cargo, is not a fault in the "management of the ship," within the exemption of the third section of the Harter act, but rather in the care or proper delivery of the cargo, within the meaning of the first section, from which she is not exempt from liability.

2. SAME—STEAMER TOPHEAVY FROM ICE.

A ship on entering port at New York during extremely cold weather in February was coated above her deck with some 200 tons of ice, which rendered her topheavy and gave her a list to starboard of 4° to 5° even when laden. Being several hours late, in order to be ready for her outward voyage the master commenced discharging immediately and rapidly, at the same time taking in coal on both sides, the most of which was stowed above the water line. After most of her cargo in the lower hold had been discharged, and her list had increased to about 8°, she rolled over to port; and in doing so the cover of a coal port on that side was broken off, leaving the opening only about a foot above the water. By shifting cargo and stopping the loading of coal on the port side, she was again rolled back, but no means were taken to close the open port, and the loading of coal proceeded until she was nearly filled to the main deck. The wind had been strong all day, and in the evening increased to a velocity of 52 miles, but the ship was protected on either side to a considerable extent by buildings on the piers. About 5 hours after she first rolled to port, and when her list to starboard had greatly increased, she again went over, and, carrying the open port below the water, filled and sank, damaging the cargo on board. *Held*, that the damage could not be attributed to the wind to such an extent as to relieve the ship from liability, since she would not have been endangered but for her unstable and topheavy condition, due to the negligent and inconsiderate manner of unloading her cargo, without any regard to the great weight of ice above her deck, and to the equally negligent loading of the coal and failure to close the open port, all of which was negligence of the ship in handling the cargo, for which she was not exempted either by the Harter act or her bills of lading.

In Admiralty. Suit to recover for damage to cargo.

Carter & Ledyard and Walter F. Taylor, for Aitken et al.
Butler, Notman, Joline & Mynderse, for Insurance Co.
Wheeler & Cortis, for claimant.

BROWN, District Judge. The above libels were filed by the underwriters and owners of cargo to recover for water damage done to the goods on board the steamship Germanic through two lurches to port while unloading, in consequence of which she took in water through

an open coal port and filled and sank at her pier in New York on February 13, 1899.

The Germanic is 455 feet long by 45 feet beam, about 34 feet depth of hold, and her gross tonnage is 5,060 tons. She arrived at her pier, 45 North river, at about noon of Saturday February 11, 36 hours late, with 172 passengers, the mails and about 1,650 tons weight of cargo. All her forward parts, including the bridge, rigging and spars as high up as the foreyard, were very heavily incrusted with ice from previous storms and intense cold; and more ice being on her starboard than on her port side, she had on arrival a starboard list of about 4° or 5°.

The amount of ice was estimated by the master and first officer at 180 tons. The consumption of about 1,082 tons of coal and water on the voyage should have lightened the ship's mesne draft, at the rate of 1 inch for every 37 tons, about 29¼ inches; the actual difference in her draft on sailing and on arrival at her dock, was but 23 inches, or 6¼ inches less, equivalent to 231 tons of ice to account for this difference. If one-half inch be allowed for a little admixture of fresh water at the dock (Shipping Co. v. Forbes [D. C.] 99 Fed. 105, 106), after the current had been running ebb about 1½ hours (The Ludvig Holberg [D. C.] 36 Fed. 917, note) we should have about 213 tons as the probable amount of ice. During Sunday and Monday there was also a heavy fall of snow, and as only a part of what fell on the ship could be removed, the residue added to her weight above deck.

The weather continued very cold after the steamer's arrival and but little of the ice could be removed. In order to have the steamer ready to sail at the appointed time on the following Wednesday, the discharge of her cargo was commenced immediately and hurried from all of her five hatches at once. At the same time she was taking in coal for the outward voyage from coal barges on both sides of her. To admit the coal barges on her port side, she was breasted off about 25 or 30 feet from the dock.

At about 4 p. m. of Monday, the 13th, after discharging about 1,370 tons weight of cargo, and when all of the cargo in the lower hold was discharged except about 155 tons, and only about 125 tons more remained on the orlop and steerage decks, her starboard list being then increased to about 8°, she suddenly rolled over from starboard to port, and kept a port list of at least 9° and probably more. In making this roll, the open cover of one of the aft coal ports, about 33 inches by 22, which opened outwards on the port side, struck the coal barge and was knocked off and went overboard, leaving the bottom of the open coal port about a foot probably above the water line.

Upon this list to port, the master, who theretofore had given no attention to the discharge of cargo or to the loading of coal, intervened and ordered that coaling on the port side should be stopped, but continued on the starboard side; that no more cargo should be taken from the lower hold, and that some sugar in bags in the lower hold should be shifted from the port wing to the starboard side.

When about 10 tons of sugar was thus shifted, the steamer at about 4:45 p. m. rolled back again to starboard, with a list of about 8° as before. Coaling was then resumed upon the port side, but was

stopped on the starboard side at about 6 p. m.; and between that and 9 p. m. all her side pockets were filled with coal up to the main deck, except one on the starboard side, which lacked about 30 tons of being full. Some 20 or 25 tons of coal were also run into her cross bunkers in the lower part of the ship, which were previously about half full; about 50 tons of dry goods and oranges were also discharged from the orlop deck and from the steerage deck, which was next above the orlop; and about 60 tons of bacon, forming a tier and a half, were put on board and evenly distributed in the bottom of the hold.

During the day the wind was a moderate gale from the northeast until about 4 p. m. It then shifted to the northwest, became more squally, and increased to from 35 to 38 miles per hour until 8 p. m., as observed at the weather bureau at an elevation of 400 feet. From 8 to 9 p. m. it was 39 miles; from 9:05 to 9:10 at the rate of 52 miles, and from 9:10 to 9:15 at the rate of 54 miles, after which it diminished, indicating a squall at that time. Although the normal direction of a northwest wind was nearly fore and aft with the line of the ship as she lay in the slip, several of the witnesses from the steamer say that the wind seemed to come athwartships from the southwest. The first officer, however, says that at 9 o'clock, the wind was not blowing so much across as before, but was more to the westward. A high shed was on pier 45, the peak of which was 54½ feet above the water line; the shed on pier 44 was 24½ feet lower. These structures might naturally deflect the wind somewhat and produce variable eddies and currents.

From the time of the second list to starboard between half past 4 and 5 p. m. until 9 p. m., the steamer's starboard list was constantly increasing. At 8 p. m. the list was 12° by the clinometer, and at 9 p. m. it reached 13°, the port rail then being 10 feet higher than the starboard rail. At a little after 9 p. m. the steamer suddenly rolled over again to port, carrying beneath the water line the lower part of the open coal port. Through this port as well as through some 28 holes where the bolts had been removed for loosening 4 of the coal ports on the port side, the water flowed into the ship more rapidly than the pumps could control it, so that the ship sank at her dock before outside relief could be obtained, damaging the goods then on board.

The libelants contend that the two lurches to port above described were caused by the unstable and topheavy condition of the ship, through the negligent unloading of cargo without any consideration of the heavy weight of ice and snow above; that there was negligence also in the continued loading of coal above her water line and center of gravity after the first list, and in the failure at once to close up the open coal port after the cover of that port was carried away by the first list to port. The respondent contends that there was no negligence in these respects; that the changes of the ship from starboard to port were harbor perils, caused by the very high wind blowing crosswise against the icy ship, and without any fault on the ship's part; and that if there was any fault in those regards, it pertained to the "management of the ship," and was within the exemption of the third section of the Harter act.

I think the libelants' contentions are substantially maintained, and that neither the Harter act nor any of the exemptions in the bill of lading exonerate the ship.

1. The damages were caused by two sudden lurches of the ship from starboard to port; one at about 4 o'clock in the afternoon, and the other a little after 9 in the evening. Both contributed to the result; the first, by knocking off the coal port and leaving a large opening exposed; the second, by carrying the bottom of that port hole below the water line. Without the second roll the first would have produced no damage to the cargo; without the first, the second would probably have carried away the cover, as the first did, and have resulted in substantially the same damage. It does not seem necessary, however, to distinguish between the two; since both, I am satisfied, were produced by the same substantial cause, namely, the instability and topheavy condition of the ship, arising from the inconsiderate unloading of nearly all her cargo, without any regard to the great weight of ice and snow above her decks.

The evidence leaves no doubt that up to the time of the ship's first lurch to port, the unloading had proceeded in the same manner as if there had been no such weight above. Out of 1,650 tons weight of cargo, all had been removed except 155 tons in the lower hold, and 125 tons on the orlop and steerage decks. As the average weight of the latter was above the water line and the center of gravity, it contributed somewhat to her instability. From the behavior of the ship and the testimony of Lieut. Spear, I have no doubt that through this inconsiderate and imprudent unloading, the center of gravity of the ship had been brought some five or six inches above the metacenter. This was a condition of unstable equilibrium, upon an even keel, and a position, therefore, which the ship could not maintain, but one in which she was liable to go from one side to the other through any comparatively small impulse.

It is impossible to hold that a ship may unload in this manner at the risk of the cargo, or that this can be deemed suitable or proper care in the unloading or delivery of cargo. It is the ship's manifest duty to pay attention to any extraordinary circumstances that evidently affect her stability while discharging, and to regulate her mode of discharge accordingly, so as not to endanger any of the goods. The unusual additional weight of over 200 tons of ice and snow which she was carrying above her decks, was much more dangerous than even a similar weight of cargo on deck would have been, since its average weight was much higher up; and if similar damage had happened through instability of the ship caused by leaving such a weight of deck cargo untouched, while the hold was nearly emptied of cargo, no question, I think, would have been made of the negligent manner of unloading, and of the ship's responsibility for the consequences. Haste to have the ship ready to sail on the following Wednesday, though it may explain the taking of the risk, cannot shift the responsibility for it upon the cargo.

It is very probable that the wind was one of the factors in the different movements of the vessel, but not to any such extent as to relieve the steamer from liability. At the time of the first list to port,

the wind was northerly; it had not yet shifted to the northwest; it was then a moderate gale, and the ship was in the lee of the shed 54 feet high on the pier. The effect of the wind upon the ship must then have been very small; it could only have been important through her unstable condition and readiness to yield to a slight impulse. At 9 p. m. after the wind had shifted to the northwest, it was much stronger for a short period, reaching during a few minutes a maximum of 54 miles per hour. Although a northwest wind even of this strength would naturally have little effect when blowing fore and aft, yet the wind is liable to such deflection and to such extremely variable eddies, when blowing between or against buildings, that I think it quite probable that the impulse from such deflected currents in connection with the steamer's topheaviness, heavy side-loading with coal above the water line, and very feeble stability in the position of her list, may have been the immediate cause of the second lurch to port. But without this topheaviness and feeble stability, a northwest squall of a maximum velocity of 54 miles could not have, produced any such lurches. Strong northwest winds are very common here in summer and in winter, and that maximum velocity is not rare. Ordinarily such winds are without effect upon vessels moored like the Germanic, if they are in proper condition. During about a month since this case was submitted, half a dozen similar squalls have been reported from the weather bureau of equal or greater maximum velocity, four of them reaching from 64 to 72 miles. The wind, moreover, had been blowing a moderate gale all day; towards evening it increased. There was abundant warning, if the strong wind was likely to damage vessels in proper condition; and the first lurch was a further specific warning of the vessel's instability, and of her liability to a similar lurch again.

Several of the claimant's witnesses indeed, speak of this storm as a blizzard, or as the severest they had ever known; but it is evident that they do not refer so much to the violence of the wind, as to its combination with severe cold; but the cold which made the weather severe for officers and men, contributed nothing to the lurches of the ship. Those were due to instability produced by rash and heedless unloading, without which the wind would have done no harm; and this negligence in unloading, aided by coaling high up in the side pockets, I must consider the primary cause of both lurches, and of the resulting damage.

Some evidence was given by the claimant to the effect that it is not uncommon for ships in unloading or loading to have a list to the extent of 5° or 6° and sometimes more; that nothing is thought of such a list, and that it is not regarded as in any way dangerous. Nelson says:

"I don't consider a ship with 5 or 6 degrees of list amounts to anything as to stability. There are plenty of steamers which we cannot load on an even keel; they won't stand on an even keel until they are entirely loaded, finished loading."

But such testimony does not meet the present case. A mere list to one side or the other, due to unequal distribution of cargo below, is no doubt of little or no importance; the ship's essential stability is

not thereby affected, and loading or unloading may nevertheless safely proceed as usual. But when the list arises from topheaviness through excessive weights above the deck, the case is altogether different. Doubtless also the rule of law is as cited by the claimant, that culpable negligence is not chargeable upon one who takes the usual precautions against accident which careful and prudent men are accustomed to take under similar circumstances. Nitroglycerin Case, 15 Wall. 524, 536, 21 L. Ed. 206; 1 Shear. & R. Neg. (4th Ed.) § 11; Whart. Neg. § 46. But this rule is inapplicable here for the reason just stated. There is no evidence that careful or prudent men or any others, are accustomed to disregard the presence of a heavy deck load, or of a great weight of ice and snow above deck and lists thereby produced, while the hold is being emptied of cargo. The circumstances, in other words, are wholly different.

2. After the first list to port the master took steps to regain a starboard list in order to avoid danger from the open coal port. But there was certainly remissness after the ship had again rolled over to starboard, (a) in not temporarily closing the open coal port with the means he had at hand for doing so; and (b) in allowing all the side pockets to be filled with coal up to the main deck, except about 30 tons in one of the starboard side pockets. This certainly increased the instability of the ship, and made it certain that in case of another list to port the ship must roll over much more than before, through the increased momentum of the increased weight above the water line and the greater increase on the port side. The greatly increased list to starboard, ranging from 9° to 13° was also a further warning to the same effect. Thus the continued loading with coal, much above the water line, was it seems to me imprudent, unless the open port hole were first securely covered. When the vessel before 5 o'clock had again turned over to starboard, the open port could have been easily closed up with the means at hand, while the port was well above the water line. But no attempt to close it was then made, nor until after the second lurch to port, when it was too late, since the work could not be effectively done after the port was below the ice and water.

3. I think the exemptions of the third section of the Harter act do not extend to this case, for the reason that the primary fault was in the manner of unloading the cargo and loading the side pockets with coal. The fault in this respect was not committed in acts done with any reference to the navigation or management of the ship, as in the cases cited by the claimant, though these acts did incidentally produce a topheavy and unseaworthy condition of the vessel. The fault was of the same nature in the case of Knott v. Worsted Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. ——; Worsted Mills v. Knott (D. C.) 76 Fed. 582,—in which the supreme court sustained the view of this court, that the fault was in the management of the cargo rather than in the management of the ship, and hence within the first section rather than the third. In the more recent case of The Manitoba (D. C.) 104 Fed. 145, the same distinction was applied.

It is true that the first section of the Harter act does not specifically speak of "unloading cargo." It forbids exemptions from liability for

"loss or damage arising from neglect or failure in proper loading, care * * * or proper delivery" of cargo. But the "unloading" of a ship is a necessary part of the "delivery" of cargo in its larger sense. Even if the word "delivery" as there used were restricted to its narrower sense, the proper unloading of the ship so as not to endanger any part of the cargo, is as obligatory as care in loading. The obligations specifically referred to in the first section were not created by that section, but have always existed; the object of that section was to prevent evasion of those long-established obligations, and the failure to enumerate "unloading" does not diminish the vessel's pre-existing obligation. Even if the failure to close up the open port were deemed fault in the "management" of the vessel while in port, and if the third section were held to include faults in port, still the damage did not "result" from that fault alone, nor was that fault the immediate cause of the damage. The immediate cause was the second lurch, produced by negligence in unloading cargo and in loading coal; and for that reason also, as I find, none of the exceptions of the bill of lading avail the defendant.

Decree for the libelants with costs.