BROWN et al. v. CORNELL STEAMBOAT CO.

(District Court, S. D. New York. July 27, 1901.)

TUG AND TOW—ABANDONMENT OF TOW IN STORM—TOW WITHOUT ANCHOR.

Respondent's tug, under a general arrangement to perform towage service for libelants on request, took a scow up the Hudson to be loaded with stone at Verplanck's Point, and after she was loaded placed her with others off Grassy Point, where it was customary to make up tows, but which was an exposed and dangerous place in severe storms from the northeast or southeast. This was at 6 p. m., and the tug agreed to return so as to start down with the tow at 9. The weather was stormy, with wind from the northeast and snow, but not so bad as to render it negligent in the tug to leave the scow where she was, or to indicate that it would not be safe to proceed with the tow that night. It became worse, however, and the tug did not return, although she could readily have done so, and taken the scow to a safer place. The scow was not provided with an anchor, as was the case with many of the stone scows, and during the night, after the storm had greatly increased, she broke from the scow to which she was fastened, and drifted upon the rocks, and was injured. Held, that the scow was in fault for not having an anchor; that the tug was in charge of the scow from the time she was taken from her moorings where she was loaded, and was charged with notice that she probably had no anchor, and with the duty of returning and taking her to a less dangerous place, and because of the failure to perform such duty was liable for one-half the loss.

In Admiralty. Suit to recover for loss of tow.

MacFarland, Taylor & Costello, for libelants.

Amos Van Etten and J. Parker Kirlin, for respondent.

BROWN, District Judge. In a northeast storm of extraordinary violence on the night of November 26, 1898, the libelants' loaded scow, No. 31, which had been made fast in a fleet of six boats at a rendezvous in the Hudson river off Haverstraw, preparatory to being towed to New York, broke adrift and was blown upon the rocks on shore. The above libel was filed to recover the damages.

The scow had been loaded with stone near Verplank's Point, and towards evening of the 26th was taken from there by one of the respondent's tugs and towed to the usual place of making up such tows off Grassy Point, about two miles below Verplanck's Point, and was there made fast by lines to the scow Katy D, which was attached to a brick scow ahead of her, which had been anchored there in the morning of that day and served as a stake boat for the rest of the tow.

When scow No. 31 was taken from Verplanck's Point the weather was unpromising, the wind being to the northward and eastward with snow, which began to fall two or three hours previously; but there were not then any indications of a storm of special severity, or such as made it probable that the tow would not be able to start at high water, about 9 p. m., the expected time of starting on that evening. In severe northeast and southeast storms, however, this place of making up tows is the most dangerous in the Hudson river, from the great width of the bay there and the absence of any shelter.

No. 31 was left in the fleet by the tug at about 6 p. m., with the promise that the tug would return in about two hours. It was in-

tended, expected and understood that the tug would start down river with the fleet at about high water at 9 p. m.; and when the tug left the boats, at about 6 p. m., her pilot was also informed by some helping tugs that other boats would be brought to join the tow. The tug then went to Grassy Point, about one-fourth of a mile distant, partly to lie up there until the hour for starting, and partly to inquire for other boats. After making some inquiries, the master and pilot on returning to their tug at about 8 p. m. found that the wind had so much increased and that the snow was so thick, as they testify, that they could not see the boats at anchor, and did not know where to find them; and on consultation they agreed that it would be dangerous to start down river with the tow, as expected; and accordingly, without any further attention to the tow, they lay at the dock at Grassy Point until about 1 a. m., when in consequence of the violence of the storm and injuries to the tug by pounding there, the tug left Grassy Point and made her way to Verplanck's Point, where she passed the rest of the night without further damage.

Meantime, between 8 and 9 p. m., three more brick scows, viz. the Townsend, the Mead and the Gladys, were brought up from Haverstraw and placed in line, in the order named, alongside the first three boats, making up a tow of six in all, lying two abreast. All the boats had anchors on board except No. 31, which had none.

By the records of the nearest station of the weather bureau at New York, the wind increased from 16 to 19 miles between 4 and 6 o'clock, to 26 miles between 7 and 8, to 27 miles from 8 to 10 o'clock, to 34 from 10 to 11, and to 48 from 11 to midnight, continuing about the same all the next day. At about 11 p. m., before the storm had reached its height, the head barges, whose anchors had previously held those behind, began to drag and the boats to pound one another. Word was therefore passed that the boats behind must cast off their lines, as they could not be held together any longer. This was accordingly done, and those having anchors cast them over. The captain of No. 31 having his wife on board, obtained permission from the Gladys, the boat alongside of him, which had an anchor, to make fast to her. Her anchor held both for about a half hour, when the anchor dragged, and not long after the Gladys foundered and sunk, and No. 31 soon drifted ashore upon the rocks. So extreme was the violence of the storm that on the next day some 30 wrecks lined the shore of the Hudson. Of the six boats of the tow, the remaining four having anchors appear not to have sustained any very material damage, although three of them dragged their anchors and brought up on the Haverstraw flats. This, as well as the pounding at Grassy Point up to 1 a. m., shows that the wind at Haverstraw continued to the east of north although northwest in New York at that hour.

There was no special contract of towage in this case. The respondent had been in the habit for many years of taking fleets of boats on request and notice from the libelants. No. 31 was taken up to Verplanck's Point for stone, with the understanding that when loaded and ready for return, she would be towed back in a fleet with other boats, in accordance with the ordinary custom and usages as respects Haverstraw tows. Such lawful customs and usages as had

become established in this business, and were known or presumptively known to the libelants, are a part of the implied contract between the parties, and so far as applicable to the case they govern the rights and obligations of each. But no previous practice of carelessness, nor customary neglect of reasonable care, prudence or nautical skill, can be set up as constituting a lawful custom, or as absolving the tug from those obligations.

The burden of proof is undoubtedly upon the libelants to prove the neglect of some duty by the respondent's tug. The evidence is voluminous, and I have carefully considered the elaborate arguments on behalf of the respective parties. The following facts seem to me to be clearly established by the evidence:

(1) The tow was made up off Grassy Point near Haverstraw in accordance with a long established custom, well known to the libelants, and in a manner reasonably safe except in very severe storms, when it was not safe, except for boats supplied with proper anchors; and that one or more such very severe storms are to be expected yearly, if not oftener. See The Germanic (D. C.) 107 Fed. 294, 298.

(2) That in merely ordinary storms when it is not deemed prudent to start with the tow at the usual time of tide, the tow previously made up and waiting is customarily left to ride out the storm, each boat being cast off by herself and riding at her own anchor; and this practice in ordinary storms, at least, is reasonably safe.

(3) That in storms of any considerable violence anchors are necessary to every boat in the tow for their security when detached and separate from each other.

(4) That while the Haverstraw brick scows are almost invariably supplied with anchors and several hands, there have been for a number of years past a great diversity in the practice of the scows that load with stone above Haverstraw; many, and perhaps one-half of them, carrying no anchor, and usually only a single working hand, although some have the man's family on board. This diversity in practice was so common that it must have been known to the captain and the pilot of the respondent's tug.

The failure of the scow to carry any anchor was unjustifiable and at the scow owner's risk. The uncertainties of navigation and the weather in riding at Haverstraw manifestly required an anchor. No. 31 was originally supplied with one of 500 pound weight, and when lost it was again replaced. Her captain, May, testified that it "held in a strong wind" and "served him in many a gale off Swinbourne Island," and I find that the scow is in fault for not having any anchor on board. If she had had a suitable anchor, as all of the rest of the fleet had, it is not probable that either the Gladys or No. 31 would have suffered serious damage.

(5) When No. 31 was taken from Verplanck's Point towards evening of the 26th, the weather, though doubtful, did not indicate any unusual storm, or that the tow would not be able to start at high water about 9 p. m. as was expected; and that no negligence is attributable to the respondent in taking the scow to the place of rendezvous at that time.

(6) That the contention of the captain and the pilot of the tug Townsend that from 8 to 9 p. m. they could not return to the tow, as promised, because they could not locate it or find it by reason of the thick snow, or go safely to it by reason of the violence of the storm at that time, is untrue, and that they might at that time have gone to the tow to give aid to any boat needing it, without danger or difficulty, as the tugs Mabel and Ingalls went between those hours with additional scows and placed them in the tow. That from 8 to 9 p. m. the wind was a moderate gale, and the snow had so increased and the weather indications were such, that the tug was justified in determining not to start out with the tow, and that no negligence is attributable to her in not proceeding to New York as was intended and expected by both parties when No. 31 was taken from Verplanck's Point.

(7) That in a severe storm for a boat without an anchor, the place of rendezvous is the worst on the Hudson river; and that at least partial protection was obtainable for No. 31, which had no anchor, on the south side of Verplanck's Point one and one-half miles above, where she might and ought to have been taken between 8 and 9 p. m by the respondent's tug.

Upon the above facts the question of the respondent's liability must depend upon whether the tug owed any further duty to No. 31 after putting her in the tow. The respondent says it did not; and that it was the business of the scow alone to look out for herself and for her own safety until the weather should permit the tug to come back and start for New York. Some of the respondent's witnesses testify to this understanding, and affirm that the tow while in waiting is not in charge of the tug.

I cannot sustain this contention. On the contrary, I must hold that No. 31 in this as in other cases, was in the charge and care of the tug from the time she was taken from her moorings at Verplanck's Point. From that moment she was no longer her own master; she was placed where it suited the tug to place her, and she was thereafter wholly subject to the tug's control. When thus left the tow was helpless, with neither motive power nor means of communication in case of need. The tug had left No. 31 at 6 p. m. under the arrangement to start about 9 p. m. and with the promise to return to her in two hours. When in the meantime the weather so changed for the worse as to make starting that night imprudent, and to require No. 31 to remain overnight in a place that was hazardous to her unless she was fully prepared, it was the duty of the tug to return to her as soon as this change of intention was made, in order to see that the tow was prepared for the change, and if not, to render whatever aid was in her power.

There was the more reason for this attention because of the known and common practice of many of the stone scows not to carry anchors, of which the captain and pilot of the tug must have been aware. The captain says he did not see any anchor on board of No. 31, but denies that he knew that she had none until the next day. This does not excuse him. In view of the known common practice, it

was his duty to attend to the tow to see what might be needed to provide for the change of intention. It is not to be supposed that the scow would have consented to leave Verplanck's Point without an anchor, had it been known that she was to ride out the night at the rendezvous. On going to the tow and upon finding that the tow had no anchor, the tug should have taken her to a less exposed place, if this were possible; and that this was easily possible between 8 and 9 p. m., and that the tug could with reasonable skill have taken No. 31, the only boat needing help, to the southward of Verplanck's Point, only one and one-half miles distant, as the captain says, I have no doubt, notwithstanding the denials, direct or equivocal, of several of the respondent's witnesses. The services of the Mabel and the Ingalls, both of them much smaller tugs than the Townsend, between those hours, are sufficient proof of this.

The duty of the tug to arrange for anchoring the boats separately so as to ride out the storm whenever the weather is so bad as not to permit starting, is testified to directly by Wyant, the pilot of the tug Ingalls, which was employed in bringing boats to the rendezvous. He says:

"If there is a storm when we take them off, we don't put them together, but we have always bunched them up together when the weather permitted. Q. When there is a storm what do you do? A. We anchor them. Q. Separately? A. Yes, if it is so that we can't put them together, we anchor them separately."

The alleged custom that the boats must look out for themselves after being once taken to the rendezvous, without any attention from the tug, or communication from her, notwithstanding any change in intention by the tug as to the time of starting, rests upon much too feeble and uncertain testimony to be accepted as discharging the tug from her ordinary duty of reasonable attention to the tow. It is opposed to the testimony of Wyant just quoted; and if better supported, would, I think, be so unreasonable as not to be admitted. If in bad weather it was the business of the tug to anchor each boat separately on taking her to the rendezvous, the tug would have had no right to take and leave her there in such weather without an anchor; and evidently, therefore, if the tug had taken her there previously without knowing whether she had an anchor or not, and bad weather intervened so as to prevent starting as expected, it was the tug's duty on the necessary change becoming known, to attend the tow and make such provision as was in her power for the changed conditions. This general duty has been frequently enforced in this court. Connolly v. Ross (D. C.) 11 Fed. 342; The Governor (D. C.) 77 Fed. 1000; Hughes v. Railroad Co. (D. C.) 93 Fed. 510; The Elmira, 23 Int. Rev. Rec. 338, 8 Fed. Cas. 577.

For the neglect of this obligation the tug is also to blame, and the damages and costs must therefore be divided.